# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Jon Smart, Appellant.

Appellate Case No. 2017-001754

————————

Appeal From Clarendon County
D. Craig Brown, Circuit Court Judge

————————

Opinion No. 5830
Submitted May 14, 2020 – Filed July 7, 2021

————————

**AFFIRMED**

————————

Appellate Defender Joanna Katherine Delany, of
Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Chief Deputy
Attorney General W. Jeffrey Young, Deputy Attorney
General Donald J. Zelenka, Senior Assistant Deputy
Attorney General Melody Jane Brown, Assistant
Attorney General Sherrie Butterbaugh, and Assistant
Attorney General Mark Reynolds Farthing, all of
Columbia; and Solicitor Ernest Adolphus Finney, III, of
Sumter, all for Respondent.

————————

**WILLIAMS, J.:**  In this criminal appeal, Jon Smart appeals the trial court's
sentence of life imprisonment without the possibility of parole (LWOP) for an
offense committed as a juvenile following a resentencing hearing pursuant to *Aiken*

*v. Byars*.[1]  Smart argues the trial court erred in its consideration of the factors required by *Miller v. Alabama*[2] and *Byars*.  We affirm.

## FACTS/PROCEDURAL HISTORY

On August 12, 1999, Smart and Stephen Hutto murdered Tracey Pack (Victim).  At the time of the murder, Smart—who was sixteen years old—and Hutto were in the custody of the Department of Juvenile Justice (DJJ) at the Rimini Marine Institute (Rimini) in Clarendon.  Victim's family had a farm with chicken houses (the Farm) near Rimini, and the family allowed juveniles at Rimini to work on the Farm.  Smart and Hutto regularly worked with Victim but would occasionally break machinery in the chicken houses in order to sneak off and huff gasoline.

Two days before the murder, a juvenile at Rimini overheard a conversation between Smart and Hutto.  He heard Smart tell Hutto that he did not think Hutto had "the guts to do it" and that Smart "would do it if Hutto" could not.  He also heard Smart and Hutto remark that "in a couple of days[,] there would be no more chicken house."  Another juvenile observed a second conversation between Smart and Hutto in which Smart said he did not think Hutto had "the guts to do it."  He also heard a conversation between Victim, Smart, and Hutto wherein Smart and Hutto asked what would happen if they killed Victim and took his truck.

Smart testified that two days before the murder, while he and Hutto were huffing gasoline, Hutto produced a box cutter and suggested they cut Victim's throat and take his truck.  Smart stated he believed Hutto was joking, but the State provided a statement from Hutto's cellmate regarding the same conversation.  According to the cellmate, Hutto said they were going to kill Victim with the box cutter but abandoned the plan because Victim's family arrived.  Hutto also told the cellmate that he and Smart wanted to see what it was like to kill someone.

On the day of the murder, Smart and Hutto were working with Victim in the chicken houses.  While Victim was on a ladder attempting to fix machinery that Smart and Hutto broke, Smart inhaled from a gasoline-soaked rag, and Hutto gave Smart a four-foot metal pipe.  Hutto encouraged Smart to hit Victim, and Smart struck Victim with the pipe and beat him to death.  Smart tried to wash away Victim's blood, and he and Hutto wrapped Victim in a tarp and hid Victim's body and the pipe in a nearby wood line.

[1] 410 S.C. 534, 765 S.E.2d 572 (2014).
[2] 567 U.S. 460 (2012).

Smart and Hutto took Victim's truck and drove to Hutto's home in Bamberg where they changed clothes, consumed alcohol, and obtained a shotgun. Smart and Hutto drove to a store, and Smart entered and robbed it with the shotgun while Hutto stayed in the truck. Afterwards, they purchased marijuana and drove to Myrtle Beach. Police officers stopped Smart and Hutto for a traffic violation and learned the truck was stolen after checking the truck's license plate. Hutto and Smart fled and led officers on a high-speed chase for thirty miles. During the chase, Smart fired the shotgun at the pursuing officers. Hutto eventually lost control of and wrecked the truck, and Smart fled into nearby trees. Officers found and arrested Smart the following morning.

Initially, Smart told officers he struck Victim after Hutto and Victim started arguing and shoving each other. However, while Smart and Hutto were in custody, Smart sent Hutto two letters: one urging him to "stick to this story" and another describing the murder but adding that he was hallucinating when he hit Victim. Smart later admitted he fabricated this story because it sounded good. At his initial sentencing hearing, Smart admitted to the facts of Victim's murder and his and Hutto's subsequent actions as described above.

On May 25, 2001, Smart pled guilty to Victim's murder, armed robbery, grand larceny of a motor vehicle, criminal conspiracy, and escape and promised to testify against Hutto in exchange for the State declining to seek the death penalty. On August 9, 2001, the trial court held a sentencing hearing for Smart and Hutto. Following the State's presentation, Smart's family addressed the court. They told the court Smart had an issue with drugs and inhaling substances but they did not have the means to get help. They also said Smart was in DJJ's custody because after Smart burglarized their neighbors' house, they convinced the neighbors to press charges with the hope that Smart would get help while in DJJ's custody. The trial court issued an LWOP sentence for Smart on the murder charge and ordered it to run concurrently with his sentences for the other charges.

On May 26, 2016, Smart moved for reconsideration of his sentence pursuant to *Byars*. On June 7, 2016, our supreme court granted Smart's motion. *Smart v. State*, 416 S.C. 583, 787 S.E.2d 845 (2016).

On May 24, 2017, the trial court held a resentencing hearing (Resentencing Hearing). The court heard arguments by Smart and the State, and it heard testimony from multiple witnesses, including Smart's sister (Sister) and Dr. David Price. Sister testified regarding Smart's childhood and family environment, and

Dr. Price testified as to his psychological evaluation of Smart. The court also admitted without objection the transcripts of the plea and sentencing hearings. On August 10, 2017, the court found Smart's LWOP sentence was appropriate and denied his motion for resentencing. This appeal followed.

## ISSUES ON APPEAL

I.      Did the trial court err in applying the *Byars* factors and imposing an LWOP sentence?

II.     Did the trial court err in failing to place on the State the burden of proof that Smart was irreparably corrupt?

## STANDARD OF REVIEW

"When considering whether a sentence violates the Eighth Amendment's prohibition on cruel and unusual punishments, the appellate court's standard of review extends only to the correction of errors of law." *State v. Finley*, 427 S.C. 419, 423, 831 S.E.2d 158, 160 (Ct. App. 2019). This court will not overturn a sentence absent an abuse of discretion. *In re M.B.H.*, 387 S.C. 323, 326, 692 S.E.2d 541, 542 (2010). A trial court commits an abuse of discretion when it commits an error of law, makes a factual finding that lacks evidentiary support, or fails to exercise any of its vested discretion. *See State v. Allen*, 370 S.C. 88, 94, 634 S.E.2d 653, 656 (2006). When interpreting the Constitution, state courts must faithfully apply the Supreme Court's precedent without expanding its protections. *See State v. Slocumb*, 426 S.C. 297, 306, 827 S.E.2d 148, 153 (2019) ("[A] long line of Supreme Court precedent prohibits us from extending federal constitutional protections beyond the boundaries the Supreme Court itself has set."); *id.* at 307, 827 S.E.2d at 153 ("[W]hile we are duty-bound to enforce the Eighth Amendment consistent with the Supreme Court's directives, our duty to follow binding precedent is fixed upon case-specific holdings rather than general expressions in an opinion that exceed the scope of any particular holding.").

## LAW/ANALYSIS

In *Miller*, the United States Supreme Court held state laws that mandate LWOP sentences violate the Eighth Amendment's prohibition of "cruel and unusual punishment" when applied to juvenile offenders. 567 U.S. at 465; *see also* U.S. Const. amend VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."). The Court stated

juveniles differ from adults in that they have greater prospects for reform and diminished culpability due to their lack of maturity and a developed sense of responsibility, vulnerability to peer pressure, limited control over their environment, and malleable character.  567 U.S. at 471.  The Court held mandatory LWOP sentences violate the Eighth Amendment because they fail to distinguish "between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'"  *Id.* at 479–80 (first quoting *Roper v. Simmons*, 543 U.S. 551, 573 (2005); then quoting *Graham v. Florida*, 560 U.S. 48, 68 (2010)).  However, the Court did not "foreclose a [court's] ability to make that judgment in homicide cases, [but] require[d] it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison."  *Id.* at 480.

Following *Miller*, our supreme court in *Byars* held juveniles serving an LWOP sentence were eligible for reconsideration.  *See* 410 S.C. at 539–45, 765 S.E.2d at 575–78.  Our court held an LWOP sentence may nevertheless be appropriate for a juvenile offender but only after the juvenile "receive[d] an individualized hearing where the mitigating hallmark features of youth [were] fully explored."  *Id.* at 545, 765 S.E.2d at 578.  The court enumerated five factors from *Miller* that a sentencing court is required to consider:

> (1) [T]he chronological age of the offender and the hallmark features of youth, including "immaturity, impetuosity, and failure to appreciate the risks and consequence[s]";
>
> (2) the "family and home environment" that surrounded the offender;
>
> (3) the circumstances of the homicide offense, including the extent of the offender's participation in the conduct and how familial and peer pressures may have affected him;
>
> (4) the "incompetencies associated with youth—for example, [the offender's] inability to deal with police officers or prosecutors (including on a plea agreement) or [the offender's] incapacity to assist his own attorneys"; and

(5) the "possibility of rehabilitation."

*Id.* at 544, 765 S.E.2d at 577 (third and fourth alterations in original) (quoting *Miller*, 567 U.S. at 477–78).  The court also stated in addition to the factors from *Miller*, "the type of mitigating evidence permitted in death penalty sentencing hearings unquestionably has relevance to juvenile [LWOP] sentencing hearings." *Id.* at 544–45, 765 S.E.2d at 577.  However, it specified that its ruling did "not go so far as . . . [to] suggest that the sentencing of a juvenile offender subject to a[n LWOP] sentence should mirror the penalty phase of a capital case." *Id.* at 544, 765 S.E.2d at 577.  *See generally* S.C. Code Ann. § 16-3-20(B)–(C) (2015) (stating the death penalty can only be imposed following a hearing wherein the factfinder, after hearing evidence related to statutory aggravating and mitigating circumstances, finds a statutory aggravating circumstance beyond a reasonable doubt and recommends death).  The court instructed trial courts to "weigh the factors discussed" in its opinion but declined to establish a specific process for the courts to follow, noting that "[t]he United States Supreme Court did not establish a definite resentencing procedure."  410 S.C. at 545 n.10, 765 S.E.2d at 578 n.10.

In *Montgomery v. Louisiana*, the United States Supreme Court noted that *Miller* did not require that states follow a particular procedure for the sentencing hearings or that courts make a formal finding that the juvenile offender was irreparably corrupt.  577 U.S. 190, 211 (2016); *see id.* ("[W]e leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." (alterations in original) (quoting *Ford v. Wainwright*, 477 U.S. 399, 416–17 (1986))).  Rather, "*Miller* established that [an LWOP sentence] is disproportionate under the Eighth Amendment" for a juvenile offender "whose crime reflects transient immaturity." *Id.*  The Court recently reiterated "that a separate factual finding of permanent incorrigibility is *not required* before a [court] imposes a[n LWOP] sentence on a [juvenile] murderer." *Jones v. Mississippi*, 141 S. Ct. 1307, 1318–19 (2021) (emphasis added).

## I.    Mitigating Factors under *Miller* and *Byars*

Smart argues the trial court erred in applying the *Miller* and *Byars* factors, specifically the factors relating to (1) his drug use and its effect on his age and youthful characteristics, (2) his family and home environment, and (3) his possibility for rehabilitation.  We disagree.

## A. Drug Use

First, Smart argues the trial court erred when it failed to consider Dr. Price's testimony that Smart's drug use caused him to suffer from a neurocognitive disorder that resulted in a younger cognitive age. Smart also asserts the court failed to consider Smart's voluntary intoxication as a mitigating circumstance. Smart further contends the trial court disregarded Dr. Price's testimony that Smart's drug use influenced his ability to appreciate the wrongfulness of his actions. We find the trial court did not abuse its discretion.

As to Smart's argument that the trial court erred in failing to consider his cognitive age, we disagree. *Miller* and *Byars* do not require consideration of a juvenile's cognitive age. Under those cases, the court must consider the "*chronological age* of the offender" and the "immaturity, impetuosity, and failure to appreciate the risks and consequence[s]" flowing from the offender's youth, not whether the offender has reached full cognitive functioning. *Byars*, 410 S.C. at 544, 765 S.E.2d at 577 (emphasis added) (quoting *Miller*, 567 U.S. at 477). Therefore, the trial court did not abuse its discretion and we affirm. *See Allen*, 370 S.C. at 94, 634 S.E.2d at 656 (stating an abuse of discretion occurs when the trial court's ruling is based on factual conclusions without evidentiary support or is based on an error of law).

As to Smart's argument that the trial court considered his drug use as an aggravating factor instead of a mitigating circumstance when it said his drug use "was not a defense," we disagree. *See Byars*, 410 S.C. at 544–45, 765 S.E.2d at 577 (stating the mitigating circumstances considered in a death penalty sentencing hearing are relevant when considering whether to sentence a juvenile to LWOP); *see also* § 16-3-20(C)(b)(2), (6) (stating in a death penalty sentencing hearing, the fact finder must consider, among other facts, whether the murder was committed while the defendant was under the influence of an emotional or mental disturbance or whether the defendant's capacity to appreciate the wrongfulness of his or her actions or to conform his or her conduct to the law was substantially impaired); *State v. Pierce*, 289 S.C. 430, 435, 346 S.E.2d 707, 710–11 (1986) ("Evidence of voluntary intoxication is a proper matter for consideration by the jury in mitigation of punishment."), *overruled on other grounds by State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991). The trial court's statement that Smart's drug use "was not a defense" does not indicate the court viewed the drug use as an aggravating factor. Rather, it indicates the court did not find it to be a compelling mitigating circumstance when considered with the other factors.

Moreover, the record shows the trial court considered Dr. Price's testimony regarding Smart's drug use and his ability to appreciate the wrongfulness of his actions. *See Byars*, 410 S.C. at 544, 765 S.E.2d at 577 ("[A] sentencing court [must] consider . . . the chronological age of the offender and the hallmark features of youth, including 'immaturity, impetuosity, and failure to appreciate the risks and consequence[s]' . . . ." (quoting *Miller*, 567 U.S. at 477)). While discussing its reasoning, the trial court stated that Dr. Price offered an opinion regarding the negative effect Smart's drug habit had on his mental health. However, the trial court noted Dr. Price also testified that Smart appreciated the wrongfulness of his actions. The court further discussed (1) Smart's attempt to conceal the crime, (2) his conflicting statements to law enforcement and letters to Hutto trying to fabricate a version of Victim's murder, and (3) the evidence that Hutto and Smart previously considered killing Victim. Therefore, the trial court did not abuse its discretion regarding this factor, and we affirm this issue. *See Allen*, 370 S.C. at 94, 634 S.E.2d at 656 (stating an abuse of discretion occurs when the trial court's ruling is based on factual conclusions without evidentiary support or is based on an error of law).

### B. Family Environment

Smart also argues that the trial court erred by considering his family's statements as evidence and disregarding Sister's and Dr. Price's testimony regarding Smart's family and home environment. We disagree.

Smart argues the trial court erred in considering his family's statements at the plea hearing as "testimony" and comparing it to Sister's testimony given at the Resentencing Hearing. We find this argument is unpreserved. *See State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 693–94 (2003) (per curiam) ("In order for an issue to be preserved for appellate review, it must have been raised to and ruled upon by the trial [court]. Issues not raised and ruled upon in the trial court will not be considered on appeal."). At the beginning of the Resentencing Hearing, the trial court noted it reviewed a copy of the prior hearings' transcripts and both the State and Smart had complied with the court's request for a copy to be entered into the record. Smart did not object when the court asked if either party objected to the admission of the transcripts. Furthermore, when the court explained the reasoning for its sentence and referenced Smart's family's statements, Smart did not argue it was error to compare their statements to Sister's testimony when the family did not appear as witnesses or give sworn testimony. Instead, Smart tried to distinguish the family's statements by asserting the family would not have been forthright with the court because they would not have admitted to their drug use.

*State v. Bailey*, 298 S.C. 1, 5, 377 S.E.2d 581, 584 (1989) (stating a party may not argue one ground at trial and then an alternative ground on appeal). Accordingly, this argument is unpreserved.

As to Smart's argument that the trial court did not consider Sister's and Dr. Price's testimony regarding Smart's family environment, we disagree. During Dr. Price's testimony, the court questioned Dr. Price and stated he and Sister "ha[d] given [it] some information to consider" regarding Smart's family and home environment. When reciting its reasoning, the trial court referred to Dr. Price's testimony concerning Smart's family environment. Furthermore, Sister and Dr. Price offered similar testimony detailing Smart's family and home environment: (1) Smart and Sister's parents were neglectful, (2) Smart and Sister's parents abused drugs, and (3) Smart began using drugs at an early age. Although the trial court did not specifically mention Dr. Price when it discussed Smart's family and home environment, it referenced Sister's testimony and referred to the three facts listed above. Therefore, we find the trial court sufficiently considered Smart's family and home environment. Accordingly, we affirm this issue. *See Allen*, 370 S.C. at 94, 634 S.E.2d at 656 (stating an abuse of discretion occurs when the trial court's ruling is based on factual conclusions without evidentiary support or is based on an error of law).

### C.     Irreparable Corruption

Smart argues the trial court erred in imposing an LWOP sentence when it did not make a finding that he was irreparably corrupt. Smart also asserts the trial court disregarded Dr. Price's opinion that Smart could be a productive member of society and made a conflicting ruling in denying his motion for resentencing despite noting there was a possibility for rehabilitation.

As to Smart's argument that the trial court erred in failing to make a specific finding of irreparable corruption, we disagree. Neither *Miller* nor *Byars* requires that the trial court make a specific finding that the juvenile is irreparably corrupt; rather, they require that the hallmark characteristics of youth be considered to determine if the crime is a reflection of the juvenile's transient immaturity. *See Miller*, 567 U.S. at 480 ("Although we do not foreclose a [court's] ability to [sentence a juvenile to LWOP] in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison."); *Byars*, 410 S.C. at 545, 765 S.E.2d at 578 ("*Miller* requires that before a[n LWOP] sentence is imposed upon a juvenile offender, he must receive an individualized hearing where the mitigating hallmark

features of youth are fully explored."); *see also Jones*, 141 S. Ct. at 1318–19 ("[T]the Court has unequivocally stated that a separate factual finding of [irreparable corruption] is not required before a [court] imposes a[n LWOP] sentence on a [juvenile] murderer.").

Further, we find the trial court properly considered Smart's possibility of rehabilitation. The record shows that the trial court concluded—based on all the evidence presented to it, including Dr. Price's testimony—an LWOP sentence was appropriate because Smart's actions did not reflect the "transient immaturity" attendant to youth and rehabilitation was unlikely. After stating there is always a possibility for rehabilitation, the court noted "[b]ut there [are] also impossibilities . . . as well." The trial court noted Dr. Price's opinion regarding Smart's mental improvement and chance to become a productive member of society, but it also noted Smart's disciplinary history following his incarceration, which included five convictions for assaultive violations and forty convictions for non-assaultive violations. The court reviewed transcripts containing testimony of the events and considered that Smart, while already in the custody of DJJ, continued to huff gasoline, planned an escape and the murder of Victim with Hutto, bludgeoned Victim to death, concealed Victim's body, robbed a store, and shot at police officers during a high-speed chase. The court also noted Smart had not participated in any rehabilitative or educational programs.[3] We find these facts support the trial court's conclusion. Accordingly, the trial court did not abuse its discretion when applying *Miller*'s "possibility of rehabilitation" factor, and we affirm this issue. *See Allen*, 370 S.C. at 94, 634 S.E.2d at 656 (stating an abuse of discretion occurs when the trial court's ruling is based on factual conclusions without evidentiary support or is based on an error of law).

---

[3] Smart argues the court erred in considering his failure to participate in rehabilitative or educational programs because some prisons withhold such programs from inmates ineligible for parole. However, the record contains no evidence that the South Carolina Department of Corrections engages in such a policy or that Smart's LWOP sentence precluded his participation. *See* Rule 210(h), SCACR ("Except as provided by Rule[s] 212 and . . . 208(b)(1)(C) and (2), [SCACR,] the appellate court will not consider any fact which does not appear in the Record on Appeal."); *State v. Serrette*, 375 S.C. 650, 652, 654 S.E.2d 554, 555 (Ct. App. 2007) (per curiam) ("[T]he burden is on the appellant to provide the appellate court with an adequate record for review.").

## II.     Presumption against LWOP

Smart argues there is a presumption against LWOP sentences for juvenile offenders that the State must overcome and the trial court erred in placing the burden of proof on him.  We disagree.

Initially, whether there is a presumption against LWOP sentences is not preserved for our review because Smart failed to raise this argument to the trial court.  *See Dunbar*, 356 S.C. at 142, 587 S.E.2d at 693–94 ("In order for an issue to be preserved for appellate review, it must have been raised to and ruled upon by the trial [court].  Issues not raised and ruled upon in the trial court will not be considered on appeal.").

Regarding Smart's argument that the trial court erred as to the burden of proof, we disagree.  First, the Supreme Court did not establish a particular burden in *Miller*. *See Montgomery*, 577 U.S. at 211 ("[W]e leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." (alterations in original) (quoting *Ford*, 477 U.S. at 416–17)).  Other states interpreting the Supreme Court's rulings have reached different results.  *Compare Commonwealth v. Batts*, 163 A.3d 410, 416 (Pa. 2017) (holding there is a presumption against LWOP sentences that the prosecution must overcome by proof beyond a reasonable doubt), *with State v. Valencia*, 386 P.3d 392, 396 (Ariz. 2016) (noting the Supreme Court in *Montgomery* stated prisoners "must be given the opportunity to show their crime did not reflect irreparable corruption" and holding the defendant bore the burden of showing by the preponderance of the evidence that his or her crime reflected transient immaturity (quoting *Montgomery*, 577 U.S. at 213)).  Second, our supreme court has not addressed whether a particular party bears the burden.  Although the court referenced our death penalty sentencing procedure—in which the State bears the burden of proof—it specifically stated that it was not requiring the resentencing hearings to mirror death penalty hearings and declined to establish a particular procedure.  *See Byars*, 410 S.C. at 544–45, 545 n.10, 765 S.E.2d at 577, 578 n.10; *see also* § 16-3-20(B)–(C).  We decline to extend federal constitutional protections beyond the bounds established by the Supreme Court and our supreme court. *Slocumb*, 426 S.C. at 306, 827 S.E.2d at 153 ("[A] long line of Supreme Court precedent prohibits us from extending federal constitutional protections beyond the boundaries the Supreme Court itself has set."); *id.* at 307, 827 S.E.2d at 153 ("[W]hile we are duty-bound to enforce the Eighth Amendment consistent with the Supreme Court's directives, our duty to follow binding precedent is fixed upon

case-specific holdings rather than general expressions in an opinion that exceed the scope of any particular holding.").  Accordingly, based on our review of the record, we find the hearing was consistent with the *Byars* requirements.  Therefore, we affirm the trial court on this issue.

**CONCLUSION**

Based on the foregoing, Smart's sentence is

**AFFIRMED.**[4]

**KONDUROS and HILL, JJ., concur.**

---

[4] We decide this case without oral argument pursuant to Rule 215, SCACR.